IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**TINA PENCHEFF,**
**ON BEHALF OF B.M.P.,**            Case No. 3:15 CV 1062
     Plaintiff,

     v.            Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.            MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Tina Pencheff ("Pencheff") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of her son, B.M.P. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons stated below, the undersigned reverses the Commissioner's decision and remands for further proceedings.

### PROCEDURAL BACKGROUND

Pencheff protectively filed an application for SSI on behalf of her son on May 31, 2012, and June 28, 2012 (Tr. Tr. 154-47, 188), alleging an onset date of April 1, 2011. (Tr. 154). The claims were denied initially and upon reconsideration. (Tr. 80-82, 84-86). Pencheff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 89). Plaintiff and Pencheff, represented by counsel, appeared and testified in Toledo, Ohio, at a videoconference hearing before the ALJ in Baltimore, Maryland. (Tr. 11-34). On December 26, 2013, the ALJ found Plaintiff not disabled. (Tr. 57-75). The Appeals Council denied Plaintiff's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981. Pencheff filed the instant action on behalf of Plaintiff on May 27, 2015. (Doc. 1).

## FACTUAL BACKGROUND

*Education Records*

In November 2010, Plaintiff's mother and Kindergarten teacher completed the Connors 3 Behavioral Rating Scale—a rating system designed to assess symptoms of Attention Deficit Hyperactivity Disorder (ADHD) and related problems.[1] (Tr. 169-71). Plaintiff's mother rated his inattention, hyperactivity/impulsivity, and defiance/aggression high—80, 90, and 80). (Tr. 169). Plaintiff's teacher rated these at 53, 69, and 86. *Id.* Plaintiff's teacher noted his behavior was getting worse in the classroom and he had a hard time keeping his hands to himself. (Tr. 171). His mother noted he was a bully to everyone and she worried about his behavioral problems. *Id.* Both his teacher and mother noted Plaintiff is "very smart." *Id.* Plaintiff was placed on ADHD medication toward the end of Kindergarten, which helped. (Tr. 172).

In August 2012, Plaintiff's first grade teacher, Kimberley King filled out a questionnaire for the Social Security Administration. (Tr. 203-09). Mrs. King reported Plaintiff had no difficulty in acquiring and using information or moving about and manipulating objects. (Tr. 204, 207). Mrs. King observed Plaintiff did have difficulty in attending and completing tasks— he rushed through his work at the end of the school year, was careless, and made mistakes often. (Tr. 205). When he finished his own work, he bothered others who were still working. *Id.* She noted these problems arose with a change of medication. *Id.* Mrs. King also observed Plaintiff

---

[1] A score above 70 on the Connors 3 is a "[v]ery [e]levated [s]core ([m]any more concerns than are typically reported.)". (Tr. 169). A score between 65 and 69 is an "[e]levated [s]core ([m]ore concerns than are typically reported." *Id.*

2

had many difficulties in interacting and relating with others, which she also attributed to a change in medication. (Tr. 206). Finally, Mrs. King observed Plaintiff had problems caring for himself or others. (Tr. 208). He was "impulsive and reckless at recess", would "refuse to change his clothes for a few days", and "often refuse to speak or talk about anything." *Id.* Mrs. King noted that on certain medications, Plaintiff was "a model student." (Tr. 209).

A note from Plaintiff's school counselor, Melanie Robinson, states that he is "extremely impulsive and can be aggressive" but that "medication has helped". (Tr. 212). He had received anger management and counseling as needed. *Id.*

*Medical Records*

    *Treating Physicians*

        *Pediatric Center*

Plaintiff was evaluated for complaints of hyperactivity and bullying at the Pediatric Center at least twice before his alleged onset date. (Tr. 312-13). In December 2010, a note indicates a school counselor suggested ADD/ADHD. (Tr. 312). An April 2011 office note states Plaintiff has trouble with bullying, being antsy, and mean behavior at school. (Tr. 311). In May 2011, Plaintiff is described as "busy!" and "doing backflips off chair!" (Tr. 310). During this time, Plaintiff was prescribed Metadate for ADHD. (Tr. 309-10). Plaintiff was seen by the Pediatric Center again in September and November 2011. (Tr. 308-09). He was fidgety and hyperactive and was seeing a school counselor for anger management. (Tr. 308). Plaintiff continued to be seen at the Pediatric Center and doctors adjusted and changed his medication for ADHD. (Tr. 301-05). In February 2012, notes indicate his mother and teacher did not think the Metadate was working and he was prescribed Focalin XR. (Tr. 305). His dosage was increased later that month. *Id*. A note from March 2012 states Plaintiff is improving at home, and there are

no complaints about school. (Tr. 303). A visit note in April 2012 states Plaintiff was still exhibiting impulsive behavior at school with sloppy homework, and bad behavior at home. (Tr. 301). This visit also contains a note that Plaintiff had recently started seeing a counselor. *Id.* Plaintiff's medication was changed to Concerta, and in May 2012, his dosage was increased. (Tr. 302-03).

*Sherry Simon, Psy.D.*

Plaintiff saw Sherry Simon, Psy.D., in March and April of 2012. (Tr. 249-52). In a two-page evaluation filled out in July 2012, Dr. Simon stated Plaintiff was "easily upset", "refuses to do homework", and "is careless, bossy, [and] mean to others", has "poor peer relations" and "continues to demonstrate symptoms of oppositional, defiant [and] noncompliant behavior." (Tr. 249-50). Dr. Simon's treatment notes include Pencheff's journal of Plaintiff's behavior from April 2012 documenting fighting with family members and being disrespectful. (Tr. 251, 256). Dr. Simon's notes also include emails between Plaintiff's teacher and Pencheff in April 2012 regarding behavioral problems. (Tr. 252-55).

*Valko & Associates*

In May 2012, Plaintiff saw someone at Valko and Associates for a Diagnostic Assessment. (Tr. 275-77).[2] The assessment indicates Plaintiff was "highly verbal from the outset" but "occasionally challenging of [the assessor] and his mother." (Tr. 276). Plaintiff was observed to be very active and get bored easily. *Id.* Diagnoses were ADHD, rule out ODD, and adjustment disorder. *Id.*

In June 2012, Plaintiff saw Diane Hysell, M.D., twice. (Tr. 278-79). Pencheff reported he had trouble going to sleep and was afraid of the dark. (Tr. 278). He returned for a second visit

---

1. The assessment has signature lines for Daniel Eble, M.Ed, PCC-S and Tim R. Valko, MD, but neither is signed. (Tr. 277).

after saying inappropriate things in school, however he was still getting good grades. (Tr. 279). His Concerta dose was increased and he was started on Ritalin. *Id.*

Plaintiff saw Dr. Hysell again in July, August, and October 2012. (Tr. 280, 294-95). Pencheff reported the Concerta lasted for six to eight hours and she had not been giving him Ritalin in the summer. (Tr. 280). Dr. Hysell continued to diagnose ADHD, ODD, and suggested continuing in therapy and continuing to take medications as prescribed. *Id.* He fidgeted during the appointment, but his "mood was good and affect was full." *Id.* In August, Pencheff reported Plaintiff was "calmer on his medications and he is generally happy." (Tr. 294). He did still act out when losing a game or wanting someone to play with him. *Id.* Plaintiff had returned to school and there had "been no significant issues at this point." *Id*. He sat calmly in his chair during the appointment, but Dr. Hysell noted "[h]is mood appear[ed] indifferent." *Id*. Again in October, Dr. Hysell noted he was doing well academically, but had gotten into trouble at school. (Tr. 295). Dr. Hysell noted Plaintiff "seem[ed] to be doing well." *Id.*

In November, Plaintiff saw Dr. Tim R. Valko. (Tr. 322). He was "pleasant" and "largely cooperative although he briefly argued with his mother about the use of an electronic game." *Id.* Pencheff was concerned about the effectiveness of his medication so both his Concerta and Ritalin dosages were increased. *Id.* In December 2012, Plaintiff returned to Dr. Valko, who noted Plaintiff "apparently has not been doing as well as we had hoped" and had expressed agitated ADHD symptoms. (Tr. 321). Dr. Valko added Risperdal to help with agitation. *Id.*

In January 2013, Plaintiff was noted to be calmer at home but still having some impulsivity issues at school. (Tr. 327). His medication dosages were again increased. *Id.* In February 2013, Dr. Valko noted Plaintiff had been receiving too low a dose of Concerta. (Tr. 329). Plaintiff made only intermittent eye contact and spent most of the visit looking out the

window and fidgeting. *Id.* Plaintiff had a similar visit in March 2013. (Tr. 339). In April 2013, Pencheff reported Plaintiff was doing well at school but "often is defiant in the morning." (Tr. 337). Dr. Valko again adjusted medications. *Id*. In May 2013, Dr. Valko noted Pencheff reported increasing impulsive behavior at school and getting in trouble at home and school. (Tr. 335). He also found Plaintiff's memory and concentration were "inattentive/distracted" and insight and judgment were "poor". (Tr. 334). Dr. Valko again adjusted medications, starting Plaintiff on Vyvanase and discontinuing Concerta. *Id.* In June 2013, Plaintiff was noted to be "stable" and his memory and concentration were "intact" and insight and judgment were "fair". (Tr. 343). Plaintiff was "almost non-verbal by choice" during the appointment. *Id*. Pencheff reported the Vyvanse made Plaintiff more tired and irritable, and that restarting Concerta had helped with focusing and concentration. (Tr. 344). *Id.*

On June 10, 2013, Dr. Valko filled out a questionnaire regarding Listing 112.11 ADHD. (Tr. 340-41). He checked that there are medically documented findings of marked inattention, impulsiveness, and hyperactivity (the "A criteria"). (Tr. 340). He also checked marked impairment in: 1) age-appropriate cognitive/communicative function; 2) age-appropriate social functioning; and 3) concentration, persistence, or pace (the "B criteria"). (Tr. 340-41). He also opined Plaintiff would have marked difficulties on a daily basis in: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating to others; and 4) moving about and manipulating objects (the "functionally equals" criteria). (Tr. 341). He also thought Plaintiff would have "some" difficulties on a daily basis in caring for himself and health and physical well-being. *Id.*

*State Agency Physicians*

Mel Zwissler, Ph.D, reviewed Plaintiff's records in August 2012 and concluded Plaintiff had marked limitation in the area of interacting and relating with others, but less than marked or no limitation in other areas. (Tr. 40-44).

Katherine Fernandez, Psy.D, reviewed Plaintiff's records in October 2012 and found him to have less than marked or no limitation in all functional areas. (Tr. 51-52).

*Hearing Testimony and Personal Background*

At the time of the September 2013 hearing, Plaintiff had been in third grade a week or two. (Tr. 15). He testified he liked his teacher and that his favorite part of school was recess where he plays football with his friends. *Id.* He played on a tackle football team outside of school every week and reported getting along with his teammates. (Tr. 15-17). He also played on a baseball team. (Tr. 20). He stated he had not been in trouble in school that year, but did sometimes the previous year, though he could not remember the reasons. (Tr. 19). He stated he has three sisters and one brother. (Tr. 20). He gets along with all of his siblings except "fight[s] a lot" with the middle one. *Id.* He testified he takes medicine every morning and afternoon, but feels like it does not help and makes his stomach hurt. (Tr. 21-22). Plaintiff stated he has to do his homework before playing video games, but he is able to do his homework by himself without being reminded. (Tr. 22). He also testified that he is able to take his medicine, brush his teeth, and get dressed without reminders. (Tr. 23). Plaintiff said he has friends in his neighborhood with whom he plays sports. (Tr. 23-24). He sometimes fights with his mom and his grandparents. (Tr. 24).

Pencheff testified Plaintiff is disabled because "from the time he wakes up, he is just bouncing off the walls, even with his medicines." (Tr. 25). She stated Plaintiff has tried several

7

different kinds of medication and that doctors are trying to adjust them and find the right one. (Tr. 25). She stated Plaintiff does not listen to her, his sisters, or his grandparents. (Tr. 26). At the time of the hearing Plaintiff was taking two medications – Concerta and Risperdal. *Id.* The Risperdal is supposed to help with aggression and impulsivity. (Tr. 32). She stated the medications help until his system gets used to it, and then it stops working. *Id.* Plaintiff was receiving counseling every other week. (Tr. 26-27). Pencheff stated Plaintiff got into trouble at school the previous year for pinching and pushing. (Tr. 27). Pencheff stated Plaintiff would not do his homework if he does not feel like it, but that she has had success requiring him to complete his homework before playing video games. (Tr. 28). Plaintiff does "fairly well" academically according to Pencheff, and does not receive any special education services. (Tr. 28-29). Pencheff stated she has to fight with Plaintiff over taking his medicine, brushing his teeth, and showering. (Tr. 29). She stated Plaintiff can socialize with other kids "until they do something or say something he doesn't like, then he gets angry with them." (Tr. 30). She said he is not often invited to other children's homes or to birthday parties. (Tr. 30-31). Plaintiff can also be destructive around the house and has made comments about running away, and wishing he were dead. (Tr. 31-32).

During the hearing Plaintiff's attorney argued—both in opening and closing statements—that Plaintiff's impairments met the requirements of Listing 112.11. (Tr. 25, 33). Plaintiff's attorney also argued in the alternative that Plaintiff was disabled due to marked limitations in attending and completing tasks, interacting and relating with others, and acquiring and using information. *Id.* Plaintiff's attorney also argued controlling weight be given to the opinion of Dr. Valko. (Tr. 33).

*ALJ Decision*

The ALJ found, in a written decision, that Plaintiff had not engaged in substantial gainful activity since the application date. (Tr. 63). He concluded Plaintiff had severe impairments of ADHD and oppositional defiant disorder (ODD), but that his impairments do not meet the severity of one of the listed impairments. *Id.* Finally, he found Plaintiff's impairments did not functionally equal the listings because he only had marked impairment in a single area—interacting and relating with others—and two marked impairments are required to satisfy functional equivalence. (Tr. 64-74). Thus, the ALJ determined Plaintiff was not disabled. (Tr. 75).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

9

## **STANDARD FOR DISABILITY**

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). For a child under the age of eighteen, "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, if a child "meets" a listed impairment, a child must demonstrate both "A" and "B" criteria of the impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th

Cir. 2003). "To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, 2009 WL 1741375, at *8 (S.D. Ohio) (citing 20 C.F.R. § 416.926(a)).

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. 20 C.F.R. § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

## DISCUSSION

Plaintiff raises two objections to the ALJ's decision: 1) the ALJ's step three determination is not supported by substantial evidence because the ALJ failed to consider whether Plaintiff's ADHD met or equaled Listing 112.11; and 2) the ALJ violated the treating physician rule with respect to Dr. Valko. (Doc. 13). The Commissioner responds that the ALJ's

decision is supported by substantial evidence and any error regarding Dr. Valko was harmless. (Doc. 15)

### *Step Three Analysis*

The claimant bears the burden of proving that a condition meets or equals a listed impairment at step three. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727-28 (6th Cir. 2004). A claimant must satisfy all the criteria to "meet" a listing. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). If the record raises a "substantial question" regarding whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any listed impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). The ALJ's decision must contain sufficient analysis to allow for meaningful judicial review of the listing impairment decision. *Id.* at 417 (remanding where "[n]o analysis whatsoever was done as to whether [the claimant's] physical impairments . . . met or equaled a Listing."). In remanding, the *Reynolds* court noted that it was "possible that the evidence [the claimant] put forth could meet" the listing at issue. *Id.* at 416.

As noted above, Plaintiff argues the ALJ erred in his step three determination because he did not explicitly analyze Listing 112.11 regarding ADHD. The ALJ's "meets or equals" analysis was, in its entirety:

> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).
>
> In reaching this conclusion, I gave substantial weight to the medical evidence and to the claimant's school records. I discuss the medical evidence and the school records at finding number five below.

(Tr. 63). Finding number five in the ALJ's decision addresses whether Plaintiff's impairments "functionally equal" the severity of the listings. (Tr. 63-74).

The listing at issue, listing 112.11 Attention Deficit Hyperactivity Disorder is "[m]anifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 112.11. As provided for in Listing 112.11:

> The required level of severity is met when the requirements in both A and B are satisfied.
> A. Medically documented findings of all three of the following:
>
> 1. Marked inattention; and
> 2. Marked impulsiveness; and
> 3. Marked hyperactivity;
>
> AND
>
> B. For ... children (age 3 to the attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 112.11.

> The appropriate age-group criteria found in B2 of 112.02 are:
>
> For children (age 3 to attainment of age 18), an impairment resulting in at least two of the following:
>
> a. Marked impairment in age-appropriate cognitive/communicative function ...; or
> b. Marked impairment in age-appropriate social functioning ...; or
> c. Marked impairment in age-appropriate personal functioning ...; or
> d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 112.02(B)(2).

As another court in this district explained in a similar case involving the same listing: "[N]umerous courts in this Circuit have addressed the situation where an ALJ conducts a functional equivalence analysis at Step Three but fails to consider whether a child 'meets' or medically equals a listing." *Dodson v. Colvin*, 2011 WL 541471, at *15 (N.D. Ohio).

Summarizing those cases, the court stated that "[t]hese courts have consistently held that an ALJ's functional equivalence analysis does not suffice to substitute for the Step Three meets or [medically] equals analysis." *Id.* (internal quotation omitted). In *Dodson*, the court found an ALJ's statement that he considered the requirements of Listing 112.11, listed the B criteria, and found the claimant's difficulties did not rise to the level of severity of the listing "for the reasons set forth below" in the functional equivalence analysis was insufficient. *Id.* at 14-15.

Nevertheless, "an ALJ's failure to explain how he reached his Step Three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure could have resolved the factual matter in another manner." *Woodall v. Colvin*, 2013 WL 4710516, at *12 (N.D. Ohio). Thus, some courts have examined the record to determine whether the same disability outcome would have resulted had the ALJ compared the evidence to the listings as required. "These courts have proceeded cautiously, however," being careful not to overstep the boundary of the standard of review. *Dodson*, 2016 WL 541571, at *15-16; *see also Layton v. Colvin*, 2013 WL 5372798, at *8 (E.D. Mich.) ("This Court cannot speculate as to how the ALJ might have weighed [conflicting or inconclusive] evidence.").

In *Dodson*, the court gave two reasons for not finding harmless error in the ALJ's failure to complete a "meets or equals" analysis. First, "the Commissioner does not expressly advance this argument or provide any explanation, in the context of the case law cited above, why the ALJ's failure in this regard is harmless. It is not the Court's role to craft this argument on the Commissioner's behalf." *Dodson*, 2016 WL 641471, at *16; *Cf. Layton*, 2013 WL 5372798, at *9-10 (applying harmless error analysis when Commissioner argued it expressly and illustrated the "B criteria" of a listing were not satisfied). Second, "the Court finds there is 'conflicting or

14

inconclusive evidence' not resolved by the ALJ and 'evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider' that prevents a finding of harmless error." *Dodson*, 2016 WL 641471, at *16 (quoting *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 657-58 (6th Cir. 2009)).

The Commissioner in this case, much like in *Dodson*, does not argue harmless error regarding the Step 3 analysis, but rather equates the six functional equivalence factors with the "B criteria" for Listing 112.11 and contends this supports the ALJ's otherwise unexplained listing decision. (Doc. 18, at 12). *Compare Dodson*, 2016 WL 541571, at *16.[3] While the undersigned understands the temptation to do so, and the two may involve similar factual analyses, the Commissioner has not provided any case law in support of equating the separate considerations, and to do so would inappropriately merge the "meets or equals" analysis with the "functional equivalence" analysis. *See, e.g., Taylor ex rel. S.T. v. Colvin*, 2013 WL 3280314, at * 7 (N.D. Ohio) ("[A]n ALJ's functional equivalence analysis does not suffice to substitute for the Step Three meets or [medically] equals analysis.").

Thus, the inquiry for the undersigned is whether there is "conflicting or inconclusive evidence" not resolved by the ALJ or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider" that prevents a finding of harmless error. *Rabbers*, 582 F.3d at 657-58. In undertaking this analysis, caution is required as it is not the court's duty to weigh evidence in the first instance.

---

3. In *Dodson*, the court noted: "[T]he Commissioner does not acknowledge either that the ALJ was required to conduct a separate meets or medically equals analysis, or that he failed to do so. Rather, the Commissioner simply glosses over this issue, citing evidence discussed by the ALJ as part of his functional equivalence analysis and arguing that it also demonstrates [claimant] does not meet the paragraph B criteria of Listing 112.11." 2016 WL 641471, at *16

Plaintiff argues Dr. Valko's opinion, Dr. Valko's treatment notes, and the Pediatric Center treatment notes support a finding of disability under Listing 112.11. (Doc. 13, at 19). The Commissioner suggests the functional equivalence factor analysis also encompasses the "meets or equals" "B criteria" analysis. (Doc. 18, at 12).

The ALJ provided a thorough analysis, weighing the evidence in the record, about whether Plaintiff's impairment "functionally equaled" a listing with regard to the six functional equivalence factors. (Tr. 63-74). The ALJ did not, however, explain how the evidence related to Listing 112.11. *See Curry v. Colvin*, 2013 WL 5774028, at *13-14 (N.D. Ohio) ("While the Commissioner is correct in noting that the ALJ discussed medical evidence in her step four analysis . . . absent some analysis from the ALJ regarding those medical observations and their relation to the criteria of [the listing], this Court cannot meaningfully determine whether substantial evidence supports the ALJ's conclusion that Plaintiff's . . . conditions did not satisfy that Listing."). The ALJ here in some parts of his decision relied on, and agreed with Dr. Valko's opinion about Plaintiff's limitations (Tr. 69-70), but in other parts found it more extreme than the medical and other evidence supported (Tr. 65-66, 67-68, 72-73, 73-74).

It is the ALJ's, rather than this court's, duty to weigh and resolve conflicts in the evidence. Based on the current record, the undersigned cannot determine, in the first instance, how the ALJ would have resolved conflicts regarding whether Plaintiff meets the requirements of Listing 112.11. To do so would be to do precisely what is not permitted—equate the ALJ's functional equivalence analysis with the "meets or equals" analysis. For example, Dr. Valko opined Plaintiff had marked difficulties in maintaining concentration, persistence, or pace – one of the "B criteria". (Tr. 341). The ALJ acknowledged concentration difficulties in his functional equivalence analysis under "attending and completing tasks". *See* Tr. 65 ("The claimant appears

16

to be able to acquire and use information despite limitations in his ability to maintain concentration."; "The claimant's mother wrote . . . that the claimant is very smart and is able to make progress in acquiring and using information, despite difficulty focusing."). The ALJ ultimately found Plaintiff had "less than marked" difficulties in attending and completing tasks by weighing the evidence in the record. (Tr. 66-67). If "acquiring and using information" under functional equivalence and "concentration, persistence, and pace" under the listings were equivalent, the ALJ's decision would be sufficient. However, the Commissioner has provided no case law to support the argument that one encompasses the other. In another instance, the ALJ agreed with Dr. Valko's opinion that Plaintiff would have marked limitation in "interacting and relating with others" by weighing that opinion with other evidence in the record. (Tr. 68-69).

Because the ALJ agreed with some of Dr. Valko's opinions, but rejected others, and as discussed below did not assign specific weight to that opinion, it is not appropriate for the undersigned to speculate how the ALJ would have resolved these conflicts in relationship to the requirements of Listing 112.11. Under these circumstances, remand is necessary to allow the ALJ to determine, in the first instance, whether Plaintiff meets or medically equals Listing 112.11. *See Risner v. Comm'r of Soc. Sec.*, 2012 WL 893882, at *5 (S.D. Ohio) ("It is not for the Magistrate Judge to step into the shoes of the ALJ and complete his job for him. The ALJ should, in the first analysis, assess whether the evidence put forth shows that Plaintiff meets or equals a Listing. Should he determine she does not, the ALJ must explain his decision with a discussion and analysis of the evidence.").

### *Treating Physician Rule*

In a related objection, Plaintiff contends the ALJ violated the treating physician rule by failing to assign weight to the opinion of treating psychiatrist, Dr. Valko. (Doc. 13, at 20-21).

17

The Commissioner's response is twofold: 1) the ALJ was not required to weigh Dr. Valko's opinion because it was "merely a check-box form completed for Plaintiff's counsel" and therefore not entitled to deference;[4] or 2) any error in failing to expressly assign weight to the opinion is harmless. (Doc. 18, at 5).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or

---

4. Plaintiff responds that this is an impermissible *post hoc* argument and the undersigned agrees. *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 192 (6th Cir. 2009). The ALJ did not offer this as a reason for discounting Dr. Valko's opinion, and in fact considered several parts of this "check box form" opinion. *See* Tr. 65, 66, 67, 69.

18

"exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's failure to explicitly evaluate and give weight to a treating physician's opinion may be harmless error in three situations: 1) where the treating physician's opinion "is so patently deficient that the Commissioner could not possibly credit it"; 2) where the Commissioner adopts the opinion of the treating source or makes findings consistent with that opinion; or 3) where the Commissioner has met the goal of giving "good reasons" even though he has not directly addressed weight assigned to the opinion. *Wilson*, 378 F.3d at 547.

The ALJ's consideration of treating physician Dr. Valko's opinion may be harmless error with regard to the functional equivalence analysis because the ALJ considered and credited the opinion in one part, and disagreed with it based on conflicts within the evidence in other parts. However, as discussed above, remand is required for the ALJ to determine in the first instance whether Plaintiff met the requirements of the listings. Because the ALJ did not address Dr. Valko's conclusion that Plaintiff meets Listing 112.11 requirements and because remand is already required, the undersigned instructs the ALJ to explicitly discuss the weight given to Dr. Valko's opinion regarding Listing 112.11.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits not supported by substantial evidence. Accordingly the decision of the Commissioner is reversed and this case is remanded for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

s/James R. Knepp II
United States Magistrate Judge
